UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

                                     Case No. 2:13-cr-17
v.                                       HON. ROBERT HOLMES BELL

DOUGLAS EMIL KUGLER, JR.,

    Defendant.
_____/

## REPORT AND RECOMMENDATION

Defendant Douglas Emil Kugler, Jr, is charged in a two-count Indictment with Aggravated Sexual Abuse of a Child Under 12 and Abusive Sexual Contact With a Child Under 12. Defendant was interviewed by FBI Special Agents Matthew Hellman and Mark Hoff at the Wisconsin Eagle River Police Department on April 3, 2013. Defendant was called by an employee of the Eagle River Police Department and asked if he would come to the department for an interview. Defendant agreed and arrived at the department at approximately 10:30 a.m. When defendant arrived, the FBI special agents introduced themselves and asked if Defendant would be willing to speak to them. Special Agent Hellman testified that Defendant was advised he was not in custody, did not have to speak, was free to leave, and would be free to leave at the conclusion of the interview. The interview lasted approximately two to three hours. The interview took place in a room that was approximately 12 feet by 14 feet. The interview was not recorded or video taped, although the technology existed in the room to record the interview. It is FBI policy not to record

interviews.[1]  Defendant was not read specific Miranda rights.  Defendant had previously been interviewed on unrelated incidents by the Vilas County Justice Center in Eagle River, Wisconsin, on August 6, 2008, regarding an alleged sexual assault of his niece and nephews.

This Indictment involves an alleged sexual assault that the victim reported to his father on December 25, 2011, and allegedly occurred at a time when Defendant was visiting his sister's house in Baraga, Michigan.  The Government asserts that Defendant initially denied sexual contact with the victim or his brother.  When Defendant was asked if he thought the boys were lying, he responded "no."  At some point during the interview, Defendant allegedly admitted to the sexual assault.  Defendant moves to suppress his statements, arguing that the statements were made involuntarily by the product of coercion and without a Miranda warning.  A hearing was conducted on March 27, 2014.

Defendant testified at the hearing and his recollection of what occurred during the interview was quite different from the testimony of Special Agent Hellman.  Defendant concedes that he drove himself to the interview after he was contacted by the Eagle River Police Department.  Defendant states that he did not know the FBI special agents wanted to speak to him and that he was nervous after they introduced themselves.  Defendant concedes that he was told he was not under arrest and would be free to leave when the interview was over.  Defendant states he did not recall

---

[1] This is at best a frustrating policy.  The recording would be the best evidence and leave little doubt as to what occurred during the interview.  In a case such as this one, where Defendant's account of what occurred is much different than Special Agent Hellman's account of what occurred, there would be no controversy regarding what was said during the interview if a recording existed.  In fact, failing to record this interview when it could have been easily recorded appears to be unprofessional and makes Special Agent Hellman's testimony less believable in light of Defendant's testimony that his statement was manipulated by the agent.  It is becoming clear that simply stating that recording interviews is against FBI policy as an excuse for not recording interviews, when the average person can record any conversation in this social media age, is predictably going to raise red flags.

being told that he did not have to speak with the agents or that he could leave at any time. Defendant did admit that he was willing to speak with the agents and had no problem talking with the agents. Defendant took one bathroom break at his request. Defendant was not promised any deals, no threats were made, and the agents never raised their voices. Contrary to Special Agent Hellman's testimony, Defendant states that he never admitted to having sexual contact with the victim and insists there were no children present at the home at the time he was there. Defendant states that he was first asked if he knew the victim and his brother and then was asked if the boys would lie. Defendant states that he told the agents he did not know the boys well and thought they would not lie. According to Defendant, the agents then told Defendant, for the first time, that the victim stated Defendant had sexual contact with him. Defendant stated it was not possible that he had sexual contact with the boy. According to Defendant, he did make the statement that he would have had to be very drunk not to remember that fact and he was not, in fact, that drunk. Defendant also stated that if he did commit such an act, he would like to apologize to the boys. Defendant stated that during the entire interview he never admitted to this conduct and always denied that he committed any acts against the victim. Defendant testified that his actual statements were manipulated by the agents to make it look like he confessed to the charged incident as set forth in Special Agent Hellman's two-page report.

The Government submits that Defendant was interviewed as part of an investigation and was not in custody at the time of the interview. Defendant argues that he was in custody and was not given Miranda rights. Defendant argues that the fact he was told he would be free to leave only after conclusion of the interview is strong evidence that he was in custody during the interrogation. Defendant argues this statement is evidence that he was not free to leave until the interview was concluded by the agents and he was granted permission to leave.

> The Fifth Amendment provides that a defendant cannot be "compelled in any criminal case to be a witness against himself." Consistent with this right against self incrimination, the Supreme Court's decision in *Miranda v. Arizona*, 384 U.S. 436, 478-479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966), ruled that suspects cannot be subjected to a custodial interrogation until they have been advised of their rights. In order to encourage compliance with this rule, incriminating statements elicited from suspects in custody cannot be admitted at trial unless the suspect was first advised of his or her Miranda rights. *Stansbury v. California*, 511 U.S. 318, 322, 114 S.Ct. 1526, 1528-29, 128 L.Ed.2d 293 (1994).

*United States v. Salvo*, 133 F.3d 943, 948 (6th Cir. 1998).

It is the compulsive aspect of custodial interrogation which led the Supreme Court to develop the Miranda doctrine. Thus, law enforcement's obligation to administer Miranda warnings is triggered only where there has been such a restriction on a person's freedom as to render him "in custody." *Miranda*, 384 U.S. at 444. In determining whether an individual is in custody, a court must examine the totality of the circumstances surrounding the interrogation, but the ultimate inquiry is simply whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. *Id.* at 1528-1529. Under this approach, courts look at factors which include: (1) the purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police or voluntarily acquiesced to the request for an interview. *Salvo* at 950.

There are several Supreme Court cases where the facts closely resemble those presently before the Court. In *California v. Beheler*, 463 U.S. 1121, 103 S. Ct. 3517 (1983), the suspect voluntarily accompanied police to the station for questioning and freely departed at the end

of the interview, after being told he was not under arrest but that his statement would be evaluated by the district attorney concerning that possibility. Similarly, in *Oregon v. Mathiason*, 429 U.S. 492, 97 S. Ct. 711 (1977), the defendant agreed to meet the investigating officer at the station house for an interview. The defendant was told he was a burglary suspect but that he was not under arrest. He was told that his truthfulness would be evaluated by the district attorney or judge. He was taken into a closed office, where he was questioned concerning the burglary. The defendant was falsely told that his fingerprints were found at the scene. After a long pause, the defendant admitted to the crime. The defendant was then given Miranda warnings, but was not arrested. He left the station after being informed that the case would be referred to the district attorney for a decision whether charges would be pursued. In *Yarborough v. Alvarado*, 541 U.S. 652, 124 S.Ct. 2140 (2004), the petitioner was driven to the police station by his parents after the investigating officer telephoned petitioner's mother and left a message that police would like to speak with the petitioner. The petitioner was interviewed by the investigating officer for about two hours and was never given Miranda warnings. Factors that weighed in favor of not finding that the petitioner was in custody and was free to terminate and leave the interview at any time included that the police did not transport the petitioner to the station or require his appearance at a particular time, he was not threatened or pressured, and there was no suggestion that he was under arrest. The petitioner's parents remained in the lobby, suggesting that the interview would be brief. The petitioner was told that the interview would not be long. The petitioner was twice asked if he needed a break during the interview. Conversely, the Supreme Court pointed to other factors that could show that the petitioner was in a more restrictive setting that weighed in favor of the view that the petitioner was in custody, such as: the interview lasted two hours at the police station, the petitioner was never told that he was free to leave, and the petitioner was brought to the police station by his parents, who were asked to

bring him instead of the petitioner arriving on his own. The Court concluded that the finding that the petitioner was not in custody during the interview was reasonable under habeas review standards. In making this finding, the Supreme Court set forth the standard to determine whether a defendant was subjected to custodial interrogation requiring Miranda warnings. The Court stated:

> Our more recent cases instruct that custody must be determined based on how a reasonable person in the suspect's situation would perceive his circumstances. In *Berkemer v. McCarty,* 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), a police officer stopped a suspected drunk driver and asked him some questions. Although the officer reached the decision to arrest the driver at the beginning of the traffic stop, he did not do so until the driver failed a sobriety test and acknowledged that he had been drinking beer and smoking marijuana. The Court held the traffic stop noncustodial despite the officer's intent to arrest because he had not communicated that intent to the driver. A policeman's unarticulated plan has no bearing on the question whether a suspect was in custody at a particular time, the Court explained. *Id.,* at 442, 104 S.Ct. 3138. [T]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation. *Ibid.* In a footnote, the Court cited a New York state case for the view that an objective test was preferable to a subjective test in part because it does not "place upon the police the burden of anticipating the frailties or idiosyncrasies of every person whom they question." *Id.*, at 442, n. 35, 104 S.Ct. 3138 (quoting *People v. P.*, 21 N.Y.2d 1, 910, 286 N.Y.S.2d 225, 233 N.E.2d 255, 260 (1967)).
>
> *Stansbury v. California,* 511 U.S. 318, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) *(per curiam)*, confirmed this analytical framework. *Stansbury* explained that the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned. *Id.,* at 323, 114 S.Ct. 1526. Courts must examine all of the circumstances surrounding the interrogation and determine how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action. *Id.,* at 322, 325, 114 S.Ct. 1526 (internal quotation marks and alteration omitted).
>
> Finally, in *Thompson v. Keohane,* 516 U.S. 99, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995), the Court offered the following description of the *Miranda* custody test:

> Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. 516 U.S., at 112, 116 S.Ct. 457 (internal quotation marks and footnote omitted).

*Id.* at 662-663; 2148-2149.

In these cases, the Supreme Court found that Miranda warnings were unnecessary because questioning did not take place in a context in which the freedom of the defendants to depart was restricted in a meaningful way. The Court acknowledged that all police interviews of those suspected of crime have coercive aspects. However, police are not required to administer Miranda warnings to every suspect they interview. It is only under the additional pressure of a custodial environment that Miranda is triggered.

The Sixth Circuit ruled that an important part of this analysis is whether the officer "explicitly tells the suspect that he or she is not under arrest" before interrogation begins. *United States v. Tummins*, 517 Fed. Appx. 342, 344 (6th Cir. 2013). This factor, along with other factors such as not restraining the defendant and not brandishing weapons or handcuffs, established that the defendant in *Tummins* was not in custody when officers entered his home and questioned about his involvement with downloading and sharing child pornography. *Id.*

In this case, the Government argues that Defendant was never taken into custody and that the interview was simply part of an investigation in which Defendant voluntarily participated. The Government bears the burden of proving by a preponderance of the evidence that Defendant's

waiver was voluntary. *See Lego v. Twomey*, 404 U.S. 477, 489 (1972); *North Carolina v. Butler*, 441 U.S. 369 (1979). In determining whether or not the waiver was voluntary, the Court is required to look at the totality of the circumstances to determine whether or not the police officers engaged in coercive conduct during the interrogation and whether or not the coercive conduct resulted in the incriminating statements. *See Colorado v. Connelly*, 479 U.S. 157 (1986). An explicit statement of waiver is not invariably necessary to support a finding that the defendant waived his right to remain silent. *See North Carolina v. Butler*, 441 U.S. 369, 375-376 (1979). Waiver cannot be established merely by showing that the accused participated in the interrogation by answering questions posed to him. *Edwards v. Arizona*, 451 U.S. 477, 484 (1981). However, waiver can be inferred from the words of the accused and his course of conduct where it is clear that the defendant understood his rights. *Butler*, 441 U.S. at 373. This court must presume that the defendant did not waive his *Miranda* rights. *Butler*, 441 U.S. at 373. The burden is on the Government to demonstrate that the defendant knowingly and intelligently waived his right to remain silent and his right to counsel. *Id.*

      The uncontradicted evidence before the Court is that Defendant voluntarily agreed to an interview at the Eagle River Police Department. There was no testimony presented that could allow the Court to presume that Defendant was under any mental duress or any impaired mental state at the time of the interview. Defendant's freedom of movement was not restricted in any meaningful way. Defendant left the interview room unsupervised to use the restroom during the interview and returned to the interview room. There is no evidence of coercive conduct or undue pressure during the interview process. Defendant was never handcuffed or placed under arrest on the day of the interview. Defendant never asked to leave or terminate the interview. Defendant testified the he was willing to talk with the agents and he voluntarily drove to the police department for the interview.

Further, Defendant was informed he was not under arrest and would be free to leave after the interview was concluded. Under these circumstances, Defendant was not in custody at the time of the interview, there is no evidence of coercion, and Defendant's voluntary statements should not be suppressed.

Accordingly, it is recommended that Defendant's Motion to Suppress Statements (Docket #15) and Supplemental Motion to Suppress Statements (Docket #23) be denied.

NOTICE TO PARTIES: Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within fourteen (14) days of receipt of this Report and Recommendation. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b). Failure to file timely objections constitutes a waiver of any further right to appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985).

/s/ Timothy P. Greeley
TIMOTHY P. GREELEY
UNITED STATES MAGISTRATE JUDGE

Dated: April 10, 2014